**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

VEGA CAPITAL LONDON LIMITED and
ADRIAN SPIRES,

     *Movants,*

v.

EXXONMOBIL OIL CORPORATION,

     *Respondent.*

Misc. Case No. 4:24-mc-1163

(Arising from Civil Case No. 1:20-cv-04577 in the United States District Court for the Northern District of Illinois)

**VEGA CAPITAL LONDON LIMITED AND ADRIAN SPIRES'**
**MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Sean Cichowski
State Bar No. 24062188
Southern District No. 1076539
AKERMAN LLP
1300 Post Oak Blvd. #2500
Houston, TX 77056
(713) 960-7363 (telephone)
(713) 960-1527 (facsimile)
sean.cichowski@akerman.com

*Attorney-in-Charge for Vega Capital London Limited and Adrian Spires*

Samuel P. Vitello*
AKERMAN LLP
1251 Ave. of the Americas, 37th Floor
New York, NY 10020
(212) 259-6424
samuel.vitello@akerman.com

*Motion for admission *pro hac vice*
forthcoming

Michael P. Kelly
Southern District No. 3870399
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 393-6222
michael.kelly@akerman.com

*Attorneys for Vega Capital London Limited and Adrian Spires*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

    I.      The May WTI Contract Is Traded at Negative Prices on April 20, 2020 ...............3

    II.     A Putative Action Was Brought Against Vega, Spires,
          and Ten Traders in the Northern District of Illinois ...................................................4

    III.    Vega and Spires Served a Narrow Subpoena on ExxonMobil ...............................6

    IV.    Vega and Spires' Efforts to Meet and Confer with
          ExxonMobil's Counsel Were Unsuccessful ..........................................................8

STANDARD OF REVIEW ................................................................................................9

DISCUSSION ....................................................................................................................9

    I.      The Subpoena Seeks Information That Is Relevant and
          Proportional to the Needs of the Case ....................................................................12

    II.     The Subpoena Does Not Subject ExxonMobil to Undue Burden........................13

    III.    Any Trade Secrets or Confidential Information Will Be Protected
          by The Illinois Court's Existing Protective Order .................................................17

CONCLUSION..................................................................................................................19

## **TABLE OF AUTHORITIES**

**Cases**                                                    **Page(s)**

*CFTC v. Parnon Energy, Inc.*, No. 11 Civ. 2543 (WHP), 2013 WL 5882921
(S.D.N.Y. Oct. 25, 2013) ..................................................................................12

*F.T.C. v. Thomas Jefferson Univ.*, No. 20-01113,
2020 WL 3034809 (E.D. Pa. June 5, 2020) ......................................................13

*Fed. Open Mkt. Comm. Of Fed. Reserve Sys. v. Merrill*,
443 U.S. 340 (1979)...........................................................................................17

*Field v. Anadarko Petroleum Corp.*, No. 4:21-cv-02375,
2021 WL 11728201 (S.D. Tex. Aug. 16, 2021) ..................................................9

*FieldTurf USA, Inc. v. Tencate Thiolon Middle E., LLC,* No. 19-2602-JWB-ADM,
2012 WL 844671 (W.D. Tex. Mar. 12, 2012) ...................................................17

*GEICO v. Mayzenberg*,
2018 WL 10517074 (E.D.N.Y. June 29, 2018) .................................................15

*In re Countrywide Fin. Corp. Sec. Litig.*,
2010 WL 1640188 (S.D.N.Y. Apr. 12, 2010).....................................................17

*In re Honeywell Int'l Sec. Litig.*,
230 F.R.D. 293 (S.D.N.Y. 2003) ........................................................................13

*In re Matter of Subpoenas Served on Non-party Series 7 of Paramount Dev. Fin. Partners 3.0
LLC*, No. 1-23-MC-00319-DII, 2023 WL 3831794 (W.D. Tex. June 5, 2023) .......................9

*In re Subpoenas to Plains All American Pipeline, L.P.*,
No. 13-mc-2975, 2014 WL 204447 (S.D. Tex. Jan. 17, 2014)....................................12, 16, 18

*MC Trilogy Texas, LLC v. City of Heath, Texas*, No. 3:22-CV-2154-D,
2023 WL 5918925 (N.D. Tex. Sept. 11, 2023)...................................................13

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
596 F. Supp. 3d 1076 (N.D. Ill. 2022) ................................................................5

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
648 F. Supp. 3d 980 (N.D. Ill. 2022) ..................................................................5

*Mish International Monetary Inc. v. Vega Capital London Limited, et al.*,
Case No. 1:20-cv-4577 (N.D. Ill.) ........................................................................1

*Rinaldi v. NICE*, No. 19-CV-424 (LGS) (KNF), 2020 WL 4340640,

(S.D.N.Y. July 27, 2020) ...........................................................................15

*Rios v. Ramage*, No. 19-2602-JWB-ADM, 2020 WL 6701206,
(D. Kan. Nov. 13, 2020) ............................................................................17

*State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy*,
LLC, 255 F. Supp. 3d 700 (E.D. Mich. 2017) ..........................................16

*Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812 (5th Cir. 2004) .............................13

**Statutes**

7 U.S.C. § 13(a)(2) ...............................................................................................5

**Rules**

Fed. R. Civ. P. 26 ...............................................................................................9

Fed. R. Civ. P. 45 ...........................................................................................9,17

Vega Capital London Limited ("Vega") and Adrian Spires ("Spires") respectfully move to compel ExxonMobil Oil Corporation ("ExxonMobil") to produce documents in response to a subpoena *duces tecum*. Vega and Spires seek the production of a limited set of documents needed to defend themselves in a putative class action pending in the United States District Court for the Northern District of Illinois. *See Mish International Monetary Inc. v. Vega Capital London Limited, et al.*, Case No. 1:20-cv-4577 (N.D. Ill.) ("Illinois Case").[1] With one exception, in the Illinois case, the Honorable Manish S. Shah has already rejected challenges by non-parties Vitol Inc. and Glencore Ltd. to requests in nearly identical subpoenas. Illinois Case, ECF 338 at 1 (attached as Ex. 1); *id.*, ECF 339 at 5:12-8:19 (attached as Ex. 2).

## INTRODUCTION

On April 20, 2020, within a few months of the onslaught of a global pandemic, the West Texas Intermediate crude oil futures contract with a May 2020 expiration ("May WTI Contract") traded at negative prices on the New York Mercantile Exchange ("NYMEX"). It was the first time in the history of NYMEX that a WTI futures contract had traded at negative prices. Vega and Spires are now seeking to defend themselves from a putative class action in the United States District Court for the Northern District of Illinois accusing them and ten traders in the United Kingdom of causing those negative prices.

The defense of Vega and Spires in that lawsuit, among other things, is that the operation of natural laws of supply and demand (and not market manipulation) caused the drop in prices. At the outset of the pandemic, there was a sharp drop in demand for oil and a vast over-supply of it. That lack of demand was particularly true for the May WTI contract, which was in the penultimate day of trading and which required any holder at the expiry of the contract on April

---

[1] Concurrent with this motion, Vega and Spires are separately filing a motion to transfer this miscellaneous action to the United States District Court for the Northern District of Illinois.

21 to accept physical delivery of the oil at Cushing, Oklahoma. To make matters worse, storage space in Cushing was nearly exhausted at the time, leaving few traders with a compelling reason to buy a May WTI contract.

The putative class action against Vega and Spires is now in the midst of discovery. To prove (among other things) that there was no demand in the marketplace on April 20 for the May WTI contract and therefore no "artificial price," Vega and Spires issued narrowly-tailored subpoenas to 28 of the largest traders on NYMEX, including ExxonMobil. The subpoenas sought only documents "sufficient to show" how and when those companies traded the May WTI Contract on April 20 and 21, 2020. From the discovery responses of these 28 companies, Vega and Spires are attempting to prove that even the largest and most sophisticated participants in the market had little-to-no desire to purchase the May WTI Contract and that their relative lack of demand illustrates why the prices for this contract were negative on April 20.

For the subpoena to ExxonMobil, Vega is now seeking the production of four categories of documents:

> (i) documents sufficient to show ExxonMobil's understanding of storage at Cushing for the May WTI contract as of April 20, 2020;

> (ii) documents sufficient to show whether and when it thought the price for the May WTI contract would go negative;

> (iii) documents sufficient to show its communications with CME, the New York Mercantile Exchange, or the Intercontinental Exchange about the May 2020 WTI contract, limited to notices received from those entities, their responses to those entities, and correspondence with those entities about the April 20, 2020 and April 21, 2020 trading in the May 2020 WTI contract; and

> (iv) documents sufficient to show the extent to which ExxonMobil agreed to accept physical delivery of oil pursuant to the May WTI Contract.

When two other large traders (Vitol Inc. and Glencore Ltd.) challenged these requests from nearly identical subpoenas, Judge Shah rejected the challenges to the first three categories of documents above. Ex. 1.

With respect to the fourth category (which might be satisfied by the production of a single document), Vega and Spires are seeking documents sufficient to show the extent to which ExxonMobil agreed to take physical delivery of the oil covered by the May WTI Contract. Vega and Spires expect that the documents will likely show ExxonMobil did not agree to accept any significant amount of oil pursuant to the May WTI Contract, even though ExxonMobil could have been paid over $37/barrel to do so. That is the type of evidence that will show the lack of demand for oil on April 20, 2020 and that there was no artificial price.

After many conferences with Vega and Spires about the subpoena, ExxonMobil has stated that it does not intend to comply with the subpoena, including with respect to the categories described by Judge Shah. For the reasons set forth below, the Court should compel ExxonMobil to comply with the subpoena and produce responsive documents.

## BACKGROUND

## I.     The May WTI Contract Is Traded at Negative Prices on April 20, 2020

On April 20, 2020, the May WTI Contract on NYMEX began the day trading at $17.73 per barrel, entered into negative prices at 1:08 pm (CT), and ultimately finished the trading day on 1:30 pm (CT) at negative $37.63 per barrel. Ex. 3 at 1, 3, 8. Under the terms of the May WTI Contract, parties holding the futures contract were generally expected to sell it by the contract's expiry on April 21, 2020 or take physical possession of the oil in May. *Id.* at 2. Each contract is for a thousand barrels of oil. *Id.* at 6. The physical delivery requirement of the contract provided speculators holding the May WTI Contract with a strong incentive to sell the contract before its expiry on April 21.

The staff of the Commodity Futures Trading Commission prepared a lengthy interim report describing "the fundamental factors of supply, demand, and storage as well as technical trading factors surrounding the May Contract . . ." in April 2020. *Id.* at 2. The CFTC staff described how an "already oversupplied global crude oil market was hit with an unprecedented reduction in demand caused by the novel coronavirus pandemic" and how "[u]ncertainty over both the magnitude and duration of that loss of demand increased volatility to historic levels." *Id.* Among other things, there were concerns about whether "OPEC Plus or other global producers could respond quickly to the reduction in demand," *id.*, and whether there would be any storage available in Cushing, Oklahoma, where the May WTI Contract required oil to be delivered, *id.* Indeed, "[i]n or about late March and early April, NYMEX and some industry participants began preparing for the prospect of negative WTI crude oil prices, changing technology and pricing models to account for this contingency." *Id.* at 2-3. However, after its lengthy review, the CFTC staff declined to "identify the root cause(s) of any price movement of the WTI Contract leading up to, on, or around April 20." *Id.* at 1 n.4. That task has been left to Vega, Spires, and the other parties in the Illinois case.

## II. A Putative Class Action Was Brought Against Vega, Spires, and Ten Traders in the Northern District of Illinois

Since August 2020, Mish International Monetary Inc. ("Mish"), a California company specializing in precious metals and rare coins, has been pursuing a putative class action against Vega. Mish later expanded its complaint to name Vega's owner, Adrian Spires, and ten traders associated with Vega as defendants in the case. In the current operative complaint, Mish asserted eight claims against them, including a Sherman Act antitrust conspiracy claim and a number of Commodity Exchange Act market manipulation claims. Ex. 4 at ¶¶ 346-393.

The Illinois case has a lengthy procedural history, including two decisions on motions to dismiss the complaint. *See Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 596 F. Supp. 3d 1076 (N.D. Ill. 2022); *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 648 F. Supp. 3d 980 (N.D. Ill. 2022). For purposes relevant here, for a market manipulation claim under 7 U.S.C. § 13(a)(2), a plaintiff must show "(1) the defendants possessed the ability to influence prices; (2) <u>an artificial price existed</u>; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *Mish Int'l Monetary Inc.*, 596 F. Supp. 3d at 1095 (emphasis added). For a Sherman Act claim, a plaintiff must prove: "(1) defendants had a contract, combination, or conspiracy ('an agreement'); (2) as a result, <u>trade in the relevant market was unreasonably restrained</u>; and (3) [the plaintiff was] injured." *Id.* at 1092 (emphasis added).

The case is now in merits discovery, and Vega and Spires intend to show, among other things, that no artificial price existed and there was no restraint of trade on the market for the May WTI Contract. To prove that no artificial price existed and that the lack of demand/over-supply of oil caused the drop in prices, Vega and Spires issued narrowly-tailored subpoenas to 28 of the largest traders in the NYMEX market.[2] The purpose of serving subpoenas was to show that the lack of demand was evidence of a market-wide phenomenon and not merely anecdotal evidence that could be cast aside. The subpoenas were served on different types of large traders,

---

[2]     The traders are: (1) Bank of China Limited; (2) Barclays Bank plc/Barclays Capital Inc.; (3) BASF Intertrade Corporation; (4) BlackRock, Inc.; (5) BNP Paribas S.A.; (6) BP Products North America, Inc.; (7) Capital One National Association; (8) Chevron USA Inc.; (9) Citadel Securities LLC; (10) Citigroup Inc.; (11) ConocoPhillips Company; (12) ExxonMobil Oil Corporation; (13) Glencore Ltd.; (14) Goldman Sachs Group; (15) ING Capital Markets LLC; (16) JP Morgan Chase Bank NA; (17) Macquarie Inc.; (18) Mercuria Energy America LLC; (19) Mitsubishi International Corporation; (20) Morgan Stanley; (21) Nomura Securities International Inc.; (22) Pacific Investment Management Company; (23) PetroChina International (America) Inc.; (24) Phillips 66 Co.; (25) Repsol Trading USA LLC; (26) Shell Trading (US) Company; (27) Socar Trading North America LLC; and (28) Vitol Incorporated.

including global financial institutions, multinational oil companies, commodities trading firms, and other large institutions. Vega and Spires kept the Illinois federal district court informed of the 28 subpoena recipients, the nature of the subpoenas, and the reasons why those subpoenas were being pursued. *See, e.g.*, Ex. 5 at 3-5 (December 14, 2023 joint status report); Ex. 6 (July 12, 2024 joint status report).

Two of the subpoena recipients, Vitol Inc. and Glencore Ltd., contested the subpoenas and refused to produce any documents. On May 30, 2024, after receiving briefing and oral argument on the matter, Judge Shah ordered Vitol and Glencore to each produce (i) "documents sufficient to show [their] understanding of storage at Cushing for the May WTI contract as of April 20, 2020;" (ii) "documents sufficient to show whether and when [they] thought the price for the May WTI contract would go negative;" and (iii) "documents sufficient to show [their] communications with CME, the New York Mercantile Exchange, or the Intercontinental Exchange about the May 2020 WTI contract, limited to notices received from those entities, [Vitol and Glencore's] responses to those entities, and correspondence with those entities about the April 20, 2020 and April 21, 2021 trading in the May 2020 WTI contract." Ex. 1 at 1.

III. **Vega and Spires Served a Narrow Subpoena on ExxonMobil**

ExxonMobil is a wholly owned subsidiary of its parent corporation, Exxon Mobil Corporation. Ex. 7 at 2. Exxon Mobil Corporation's business "involves exploration for, and production of, crude oil and natural gas and manufacture, trade, transport and sale of crude oil, natural gas, petroleum products, petrochemicals and a wide variety of specialty products." Ex. 8 at 1. In particular, "ExxonMobil's Downstream segment manufactures, trades and sells petroleum products." *Id.* at 24. Exxon Mobil Corporation "uses commodity-based contracts, including derivatives, to manage commodity price risk and for trading purposes." *Id.* at

55.   Exxon Mobil Corporation earned $178.57 billion of revenue in 2020, down from $225.58 billion in 2019.   *Id*. at 36.

ExxonMobil saw the effects of the pandemic when it emerged in early 2020.   On April 7, 2020, Exxon Mobil Corporation announced it was "reducing its 2020 capital spending by 30 percent and lowering cash operating expenses by 15 percent in response to low commodity prices resulting from oversupply and demand weakness from the COVID-19 pandemic."  Ex. 9 at 1.  It subsequently reported that

> [d]uring the first and second quarters of 2020, the balance of supply and demand for petroleum and petrochemical products experienced two significant disruptive effects. On the demand side, the COVID-19 pandemic spread rapidly through most areas of the world resulting in substantial reductions in consumer and business activity and significantly reduced demand for crude oil, natural gas, and petroleum products. This reduction in demand coincided with announcements of increased production in certain key oil-producing countries which led to increases in inventory levels and sharp declines in prices for crude oil, natural gas, and petroleum products.

Ex. 8 at 7.

Vega and Spires' subpoena to ExxonMobil was served on the company's registered agent on November 16, 2023, with a compliance date of December 18, 2023.  Ex. 10.  The subpoena contains nine requests for documents "sufficient to show" ExxonMobil's involvement in the May WTI Contract on the last two days of trading on April 20 and 21, 2020.  The following categories reflect the scope and content of the nine requests:

- Documents sufficient to show ExxonMobil's trades and investments in the May WTI Contract from April 20 to April 21, 2020, including the amount and timing of any trades and the amount of any short or long positions. *See id.* at Requests 1-3.

- Documents sufficient to show whether ExxonMobil knew or believed that the May WTI Contract could trade at negative prices and ExxonMobil's trading strategy in connection with that contract.  *See id.* at Requests 4-6.

- Documents sufficient to show whether ExxonMobil accepted (or considered accepting) the physical delivery of any oil covered by the May WTI Contract. *See id.* at Request 7.

- Documents sufficient to show communications between ExxonMobil and CME Group or third-parties and other information relating to the May WTI Contract. *See id.* at Requests 8-9.

After Judge Shah ruled on the subpoena enforcement motions for Vitol and Glencore, Vega and Spires narrowed the scope of their subpoena requests to ExxonMobil in order to conform them with Judge Shah's order.

## IV.  Vega and Spires' Efforts to Meet and Confer with ExxonMobil's Counsel Were Unsuccessful

Before filing with this motion, Vega and Spires met and conferred with counsel for ExxonMobil on at least sixteen separate occasions to determine whether the parties could reach an agreement on the production required by the subpoena.  On November 29, 2023, Vega and Spires agreed to extend ExxonMobil's time to respond to the subpoena and explained the reasoning behind the subpoena.  On December 8, 2023, ExxonMobil sent Vega and Spires its objections to the subpoena.  Ex. 11.  Among other objections raised, ExxonMobil objected to the subpoena as "overbroad, unduly burdensome, and seeking information that is beyond the scope of permissible discovery considering the importance of the issues at stake," and further objected to the requests "as seeking sensitive, confidential, and proprietary commercial information." *Id.* at p. 7-14.

Following the receipt of ExxonMobil's objections, Vega and Spires conferred with ExxonMobil approximately fifteen additional times about ExxonMobil's objections and searched to see if a compromise could be reached.  The parties discussed potential options, but none of those discussions resulted in any agreement by the parties.  On June 24, counsel for ExxonMobil informed Vega and Spires' counsel that ExxonMobil did not intend to produce any documents in

response to the subpoena, including any documents responsive to the three categories approved by Judge Shah.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 45 allows parties to subpoena nonparties for documents relevant to a civil suit. Fed. R. Civ. P. 45(a)(1)(D). Subpoenas issued under Rule 45 are "subject to the relevance requirement of Rule 26(b)(1)," which provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." *Field v. Anadarko Petroleum Corp.*, No. 4:21-cv-02375, 2021 WL 11728201, at *1 (S.D. Tex. Aug. 16, 2021). "The party seeking discovery bears the initial burden of showing that the materials and information sought are relevant to the action or will lead to the discovery of admissible evidence." *In re Matter of Subpoenas Served on Non-party Series 7 of Paramount Dev. Fin. Partners 3.0 LLC*, No. 1-23-MC-00319-DII, 2023 WL 3831794, at *2 (W.D. Tex. June 5, 2023) (internal citations omitted). "If the party seeking discovery meets that burden, the burden shifts to the party resisting discovery to show why the discovery is not proper." *Id.*

## DISCUSSION

The Court should compel ExxonMobil to comply with four requests in Vega and Spires' subpoena because: (i) the subpoena seeks information that is relevant and proportional to the needs of the Illinois case; (ii) the subpoena does not subject ExxonMobil to an undue burden; and (iii) any trade secrets or confidential information can be protected by the Illinois court's existing protective order.

In interpreting nearly identical subpoenas, Judge Shah has already compelled the production of documents sufficient to show three of the categories of documents sought by Vega and Spires here. Judge Shah's orders were addressed to Vitol Inc., "the world's largest

independent oil trader,"[3] and Glencore Ltd., "a major producer and marketer of commodities

with around 150,000 employees and contractors and a strong footprint in over 35 countries . . . "[4]

In particular, Judge Shah ordered the following:

> So after balancing all of the requisite interests here, I am ordering the subpoena respondents, Vitol and Glencore, to respond on three topics and produce documents on three topics:
>
> No. 1, documents sufficient to show your understanding of storage at Cushing for the May WTI contract as of April 20, 2020;
>
> No. 2, Documents sufficient to show whether and when you thought the price for the May WTI contract would go negative. You don't need to produce documents explaining in depth how or why you knew that, but some indicia of the basis for that belief; if it existed, that belief;
>
> Finally, No. 3, documents sufficient to show your communications with CME, the New York Mercantile Exchange, or the Intercontinental Exchange about the May 2020 WTI contract, limited to notices received from those entities, your responses to those entities, and correspondence with those entities about the April 20, 2020 and April 21, 2020 trading in the May 2020 WTI contract."

Ex. 2 at 7:15-8:8.

For these three categories of the documents, Judge Shah explained why Vega and Spires's

subpoena was enforceable:

- "Although there are other subpoena respondents who have worked out compliance with subpoenas, I am persuaded that Vitol's and Glencore's roles in the market make them different and increases the potential relevance of their participation and their insight into the events surrounding the May 2020 WTI futures contract. Vitol's and Glencore's evidence may have value that isn't already covered by other subpoena respondents." *Id.* at 5:15-21.

- "I also agree with Vega that the protective order can mitigate the competitive risk. Ultimately, the information will likely be mediated through expert testimony, which can also separate the most sensitive information from falling into the hands of the defendants themselves. That the experts are also consultants in the industry

---

[3]     https://www.reuters.com/business/energy/energy-trader-vitols-2023-revenue-falls-more-than-20-2024-03-26/  (last visited on July 18, 2024).

[4]     https://www.glencore.com/who-we-are/at-a-glance (last visited on July 18, 2024).

doesn't persuade me that they can't comply with the terms of a protective order. So relevance and confidentiality don't suffice to forgive Glencore and Vitol from complying with the subpoenas entirely." *Id.* at 5:22-6:5.

- "Vega already has access to information to explain why the May contract was undesirable. But corroboration is relevant. The stakes are high in this case, and all parties and respondents can bear the expense of some discovery without disruption. Vitol's and Glencore's perception of the market and their understanding of storage capacity at Cushing are relevant to Vega's theories, and that's different than evidence of actual capacity." *Id.* at 7:2-9.

- "Vega's request for information 'sufficient to show' is an effort to limit burden on the subpoena respondents, and subpoena respondents can make a sufficient showing with, I conclude, minimal burden and minimal revelation of competitively sensitive information, as I'll describe." *Id.* at 7:10-14.

- "Stepping back a bit. I suspect there are executive summaries of Glencore's and Vitol's understanding and reaction to the May 2020 WTI futures contract, and that's what should be produced.

  Again, to give you a sense of where I am coming from, I agree with Vega that it's reasonable to expect that, for example, Vitol's CEO received some sort of briefing, and that kind of document would be sufficient to comply with my order. Notwithstanding the protection of the protective order, subpoena respondents can redact analysis. I am not turning third parties into unretained experts here." *Id.* at 8:9-19.

For the fourth category of document requests (which Judge Shah did not approve in his order for Vitol and Glencore), ExxonMobil should be required to produce documents sufficient to show whether it agreed to accept physical delivery of WTI oil pursuant to the May WTI Contract and, if so, how much. As Judge Shah observed, "[w]hat is most relevant to Vega is why the price went negative and why these oil traders didn't seize on the negative price to make profitable trades." *Id.* at 6:22-25. By obtaining evidence that ExxonMobil did not agree to accept physical delivery of WTI oil in sufficient quantities to affect the price of the May WTI Contract (even when ExxonMobil would have been paid to do so), Vega and Spires will obtain powerful evidence showing that there was no demand for the May WTI Contract, that there was

no artificial price on April 20, 2020, and that there was no market manipulation on that day or injury to Mish.

## I. The Subpoena Seeks Information That Is Relevant and Proportional to the Needs of the Case

Vega and Spires are seeking information that is directly relevant and narrowly tailored to the merits issues in the Illinois case. In market manipulation cases, courts have found the production of information from nonparty traders to be relevant, stating, in part:

> [T]he WTI market's alleged switch between contango and backwardation is central to Plaintiffs' manipulation and monopolization claims. Far from being irrelevant, documents indicating the perceptions and reactions of 'innocent' nonparty traders are highly probative of whether this phenomenon occurred and how it impacted the market. Information about the nonparties' activities before and after the alleged manipulation is also relevant to provide a benchmark for activity in a nonmanipulated market.

*CFTC v. Parnon Energy, Inc.*, No. 11 Civ. 3543(WHP), 2013 WL 5882921, at *3 (S.D.N.Y. Oct. 25, 2013), *aff'd*, 593 F. App'x 32, 36 (2d Cir. 2014); *see also In re Subpoenas to Plains All Am. Pipeline, L.P.*, No. H-13-2975, 2014 WL 204447, at *5 (S.D. Tex. Jan. 17, 2014) ("[Nonparty's] role in the physical and futures market during the time period at issue, which would yield or could lead to the discovery of evidence regarding deliverable supplies and market conduct, is discoverable in the [underlying] enforcement and class actions.") (discussing *Parnon*).

In this case, the four requests of the subpoena seek information that will help to establish that there was no artificial price for the May WTI Contract on April 20, 2020 and no restraint on trade. As one of the world's leading marketers of crude oil and oil products, ExxonMobil possesses important information on why there was not more demand for the May WTI Contract on April 20, 2020. When the price dropped to -$37.63 per barrel, a trader like ExxonMobil theoretically could have purchased contracts covering a million barrels of oil and immediately made over $37 million from the transaction – even before selling the oil at some later point.

Why did ExxonMobil not do so? If it did purchase the May WTI Contract at zero or negative prices, why did ExxonMobil and other similar companies not make these purchases in sufficient quantities to drive the price of oil futures contracts up? This lack of demand occurred during a time when ExxonMobil needed cash and was sharply cutting its spending and expenses "in response to low commodity prices resulting from oversupply and demand weakness from the COVID-19 pandemic." Ex. 9 at 1. If ExxonMobil refused to be paid to accept ownership of a valuable commodity under these circumstances, it will help a jury see that it was not ten individual traders from the United Kingdom who were driving the lack of demand. ExxonMobil will not be asked to serve as an expert witness, but only provide documents as a fact witness about what it knew, thought, and did on April 20 and 21, 2020.

## II.   The Subpoena Does Not Subject ExxonMobil to Undue Burden

Compliance with the subpoena would not impose an undue burden on ExxonMobil. In determining whether the burden imposed by a subpoena is undue, courts consider factors such as "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *MC Trilogy Texas, LLC v. City of Heath, Texas*, No. 3:22-CV-2154-D, 2023 WL 5918925, at *7 (N.D. Tex. Sept. 11, 2023) (citing *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004)).

*Relevance and Need.* The need for discovery from ExxonMobil is compelling because the information from the largest traders can best prove why there was no significant demand for the May WTI Contract at zero or negative prices. *See In re Honeywell Int'l Sec. Litig.*, 230 F.R.D. 293, 302 (S.D.N.Y. 2003) (finding that a subpoena request seeking documents regarding a nonparty auditor's independence was "clearly relevant to a possible [] defense"); *F.T.C. v.*

13

*Thomas Jefferson Univ.*, No. 20-01113, 2020 WL 3034809, at *2 (E.D. Pa. June 5, 2020) (finding "compelling need for [subpoenaed] information, as it cannot be acquired from any of the parties").

ExxonMobil may argue that some large traders have provided documents responsive to Vega and Spires' subpoenas. However, to make a persuasive showing to a jury, Vega and Spires need to show that a variety of large traders had no demand for oil, including multinational oil companies, large financial institutions, and commodity traders, and that the lack of demand was market-wide and not the idiosyncratic choice of a few large companies. That is why Vega and Spires focused on serving document subpoenas on the largest traders who would have the greatest ability to accept physical delivery of oil – like ExxonMobil. Documents from a worldwide market leader like ExxonMobil are important to show the jury that there was no demand for oil and that the price was not artificial on April 20.

Moreover, this information cannot be obtained anywhere else. The plaintiff in the Illinois case has put forward its only proposed expert, Dr. Craig Pirrong of the University of Houston, who admitted in a deposition that he would have to speculate as to the intent of large traders on April 20, 2020. For instance:

> Q.     And if I ask you about any other large traders, like BP or Shell, would you have any personal knowledge of how or why any of those traders traded that day? . . . .
>
> A.     No, I do not under- -- I do not have knowledge of their intent in terms of how they were trading.

Ex. 12 at 549:15-23. Dr. Pirrong attempted to infer the intent of traders (generally speaking) from anonymized market data, but admitted that he had to speculate when confronted with questions about why more people were not submitting buy orders when the price of the May WTI Contract dropped to negative numbers. For instance:

14

Q.    Why do you think the number of buy orders didn't increase as the price of [the] May contract continued to drop throughout the day?

A.    So you're asking me to speculate, in essence.  But basically order imbalance indicates that there is more negative private information than positive private information.

So the standard economist's interpretation, financial economist's interpretation of this order imbalance, is that it would reflect, you know, with the exception of the imbalance contributed by the Vega defendants, that would reflect negative -- you know, adverse, bearish private information.

*Id.* at 534:2-18.

***Breadth, Time Period, Burden, and Particularity.***  The subpoena is narrowly tailored to obtain only information "sufficient to show" relevant to ExxonMobil's trading of one product (the May WTI Contract) on two days (April 20 and 21).  Each of the four categories in the current subpoena request is specific, discrete, and narrowly tailored in terms of subject matter and temporal scope.  *Compare Rinaldi v. NICE*, No. 19-CV-424 (LGS) (KNF), 2020 WL 4340640, at *5 (S.D.N.Y. July 27, 2020) (finding defendant's third party subpoena requests "relevant, proportional to this case and narrowly tailored in content and time" where requests sought information on one topic during an eight-month time period) *with GEICO v. Mayzenberg*, No. 17 CV 2802 (ILG)(LB), 2018 WL 10517074, at *3 (E.D.N.Y. June 29, 2018) (finding subpoenas issued to nonparties as "overbroad in that they seek documents and information without a temporal limitation that is proportional to the needs of this case").

The burden on ExxonMobil should not be significant in complying with the subpoena. With respect to the fourth category of documents sought by Vega and Spires, under NYMEX Rule 716, ExxonMobil needed to be prepared to state how it would accept physical delivery of oil pursuant to the May WTI Contract if asked to so by its futures commission merchant.  In particular, Rule 716 of NYMEX's rulebook states that:

15

> Prior to the last day of trading in a physically delivered contract, each clearing member shall be responsible for assessing the account owner's ability to make or take delivery for each account on its books with open positions in the expiring contract. Absent satisfactory information from the account owner, the clearing member is responsible for ensuring that the open positions are liquidated in an orderly manner prior to the expiration of trading.

Ex. 13. It should be straightforward to locate a single document in ExxonMobil's possession identifying whether it agreed to accept physical delivery of WTI oil pursuant to the May WTI Contract and, if so, how much oil it agreed to accept. *Cf.* Ex. 2 at 8:14-15 ("I agree with Vega that it's reasonable to expect that, for example, Vitol's CEO received some sort of briefing . . . ." about what happened on April 20).

*Proportionality.* Finally, it would be proportionate for ExxonMobil to produce this discovery. The WTI futures contract is "a commodity that is central to the functioning of the world economy," and litigation over whether a WTI contract had an artificial price on a historic day is "of national, and indeed international, import." *In re Subpoenas to Plains All Am. Pipeline, L.P.*, 2014 WL 204447, at *5, *7. The amount in controversy is high: the Illinois plaintiff alleges the traders associated with Vega made hundreds of millions of dollars in profit on April 20, 2020, and demands, among other things, actual and treble damages on behalf of itself and the putative class. Ex. 4 at ¶ 255, Prayer for Relief, ¶¶ J, K; Ex 2 at 7:4-6 (Judge Shah: "[t]he stakes are high in this case, and all parties and respondents can bear the expense of some discovery without disruption"). The amount in controversy in the Illinois case therefore exceeds $1 billion, which weighs in favor of the requested discovery. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 255 F. Supp. 3d 700, 710 (E.D. Mich. 2017) (finding proportionality factors "tip[ped] far towards" permitting the requested nonparty discovery where, inter alia, the amount in controversy included treble damages and "the potential for a multi-million dollar verdict"), *aff'd*, 2017 WL 3116261 (E.D. Mich. July 21, 2017); *see also*

16

*In re Countrywide Fin. Corp. Sec. Litig.*, No. WH M8–85 (JGK), 2010 WL 1640188, at *2 (S.D.N.Y. Apr. 12, 2010) (finding that a nonparty subpoena seeking a "limited group of documents" was not "unduly burdensome or disproportionate" and "would be very relevant to the issues in the case because the documents would reflect a contemporaneous analysis of the value of [a company's assets]").

### III.     Any Trade Secrets or Confidential Information Will <u>Be Protected by The Illinois Court's Existing Protective Order</u>

The Illinois court's protective order will protect any trade secrets or confidential information in ExxonMobil's production.  "[T]here is no absolute privilege for trade secrets and similar confidential information."  *Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 362 (1979).  As such, "[t]he Federal Rules provide that the court 'may'—but is not required to—quash or modify a subpoena that requires disclosure of 'a trade secret or other confidential research, development, or commercial information."  *Rios v. Ramage*, No. 19-2602-JWB-ADM, 2020 WL 6701206, at *6 (D. Kan. Nov. 13, 2020) (quoting Fed. R. Civ. P. 45(d)(3)(B)(i)).

To the extent that ExxonMobil is concerned about producing information it claims is confidential or amounts to trade secrets, the Court should find that any concerns about disclosing such information are addressed by the protective order that governs discovery in the Illinois case. Courts regularly compel production of such discovery where it is relevant and necessary to the underlying action and the nonparty's interests are sufficiently protected by a confidentiality or protective order.  *See, e.g., FieldTurf USA, Inc. v. Tencate Thiolon Middle E., LLC,* No. 19-2602-JWB-ADM, 2012 WL 844671, at *3 (W.D. Tex. Mar. 12, 2012) (denying motion to quash subpoena which "required the disclosure of trade secrets" because "[t]here is a Confidentiality Order already in place in the underlying litigation, and it applies to information provided by third

17

parties"); *In re Subpoenas to Plains All Am. Pipeline, L.P.*, 2014 WL 204447, at *6 (agreeing that subpoenaed nonparty "has not shown an identifiable risk that its information, albeit sensitive, will be used for improper business purposes in violation of the protective order" in the case).

The protective order in the Illinois case allows parties and nonparties to designate discovery material as "Confidential" or "Highly Confidential," and contains restrictions on disclosure for each designation. Ex. 14 at §§ 2.1, 2.2, 4.2, 4.3. The restrictions for "Highly Confidential" designations are akin to attorneys' eyes only and will not permit any of the parties (including Mish, Spires, or the ten traders) to view ExxonMobil's highly confidential information. *Id.* at § 4.3. The protective order limits use of discovery material to the Illinois case and expressly forbids it from being used for any "business, commercial, or other purpose." *Id.* at §§ 1.1, 4.1. Its terms are binding on all lawyers, parties, and persons subject to its terms. *Id.* at § 13.3. And any consultants, experts, or witnesses who may receive or view designated material must sign the attached acknowledgement and agreement to be bound by its terms, subject to "sanctions and punishment in the nature of contempt" for any violation. *Id.* at §§ 4.2(e), 4.2(g), 4.3(e), 4.4, and Exhibit A to Stipulated Protective Order.

## **CONCLUSION**

For the foregoing reasons, Vega and Spires respectfully request that the Court grant this

motion and (1) compel ExxonMobil to comply with the subpoena issued by Vega and Spires, and

(2) grant any other relief the Court deems appropriate.

Dated: July 22, 2024

Respectfully submitted,

AKERMAN LLP

By: */s/ Sean Cichowski*
Sean Cichowski
State Bar No. 24062188
Southern District No. 1076539
1300 Post Oak Blvd. #2500
Houston, TX 77056
(713) 960-7363 (telephone)
(713) 960-1527 (facsimile)
sean.cichowski@akerman.com

*Attorney-in-Charge for Vega Capital London
Limited and Adrian Spires*

Samuel P. Vitello*
AKERMAN LLP
1251 Ave. of the Americas, 37th Floor
New York, NY 10020
(212) 259-6424
samuel.vitello@akerman.com

*Motion for admission *pro hac vice*
forthcoming

Michael P. Kelly
Southern District No. 3870399
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 393-6222
michael.kelly@akerman.com

*Attorneys for Vega Capital London Limited
and Adrian Spires*

### CERTIFICATE OF CONFERENCE

I hereby certify that I spoke with Seth Isgur, counsel for ExxonMobil Oil Corporation, by videoconference approximately sixteen times between November 29, 2023 and June 24, 2024 about the subpoena. On June 24, 2024, I advised Mr. Isgur that Vega Capital London Limited and Adrian Spires intended to move to compel production of documents pursuant to the subpoena. Mr. Isgur advised me that ExxonMobil would oppose the motion to compel.

/s/ Michael P. Kelly
Michael P. Kelly

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on July 22, 2024, a true and correct copy of the foregoing Movants

Vega Capital London Limited and Adrian Spires' Motion to Compel Production of Documents

was served upon the following counsel for ExxonMobil Oil Corporation by email:

Seth M. Isgur, Esq.
William K. Grubb, Esq.
McGINNIS LOCHRIDGE
609 Main St, Suite 2800
Houston, TX 77002
(713) 615-8545 (phone)
sisgur@mcginnislaw.com
WGrubb@mcginnislaw.com

/s/ Michael P. Kelly
Michael P. Kelly