**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VEGA CAPITAL LONDON LIMITED and ADRIAN SPIRES**<br><br>　*Movants,*<br><br>**v.**<br><br>**EXXONMOBIL OIL CORPORATION**<br><br>　*Respondent.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 1:24-cv-07108**<br><br>**Hon. Judge Manish S. Shah** |

**EXXONMOBIL OIL CORPORATION'S RESPONSE IN OPPOSITION**
**TO VEGA CAPITAL LONDON LIMITED'S AND ADRIAN SPIRES'S**
**MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

ExxonMobil Oil Corporation ("ExxonMobil") submits this response to Vega Capital

London Limited's and Adrian Spires's (collectively, "Spires/Vega") Motion to Compel Production

of Documents ("Motion").

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................2

ARGUMENT & AUTHORITIES ...........................................................................................8

I.     The Requested Materials Comprise Confidential and Sensitive Information ...................8

II.    Spires/Vega's Arguments—and the Court's Ruling—as to Vitol and Glencore Are
Inapplicable Given ExxonMobil's Relatively Limited Trading Activity. .........................10

III.    Spires/Vega Have Not Carried Their Burden in Demonstrating that the Requested
Materials Are Necessary and Relevant. ...........................................................................13

        A.    Having Already Obtained Documents from Multiple Companies
(Including Vitol, Glencore, and at Least Three Multinational Oil
Companies) that Engage in More Trading than ExxonMobil, Spires/Vega
Have Not Established that ExxonMobil's Documents Are Necessary. ................14

        B.    Documents Obtained from ExxonMobil Would Not Be Admissible in the
Main Action, Which Further Undermines any Argument that Spires/Vega
Need the Documents. .........................................................................................18

        C.    Spires/Vega's Request to Compel ExxonMobil to Produce the Fourth
Category of Documents Is Based on the Same Arguments the Court
Rejected in the Vitol and Glencore Actions, and the Arguments Are Even
Weaker Now that at Least 12 Storage Companies Have Produced
Documents. ........................................................................................................20

IV.    To the Extent Spires/Vega's Motion Is Not Denied in Its Entirety, the Court
Should Defer Any Ruling Until Class Certification Is Decided, as that Decision
Will Inform the Analysis of Whether the Subpoena Is Proportional to the Needs
of the Case.........................................................................................................................22

CONCLUSION.......................................................................................................................24

# **TABLE OF AUTHORITIES**

**Cases**

*Burns v. SeaWorld Parks & Entertainment*,
   2023 WL 11884592, at *1 (E.D. Pa. Nov. 4, 2023) ................................................................ 19

*Concord Boat v. Brunswick Corp.*,
   1996 WL 705260, *3 (N.D. Ill. Dec. 4, 1996) ........................................................................... 14

*In re NASDAQ Market-Makers Antitrust Litig.*,
   164 F.R.D. 346, 355 (S.D.N.Y. Jan. 16, 1996) .......................................................................... 10

*Quantlab Techs. v. Godlevsky,*
   2012 WL 12894142, at *1 (S.D Tex. Feb. 27, 2012) ................................................................ 10

*Suture Express v. Cardinal Health 200*,
   2014 WL 6478077, at *4 (N.D. Ill. Nov. 18, 2014) .................................................................. 13

*Treadwell v. Salgado*,
   2021 WL 11725352, at *3 (N.D. Ill. Dec. 14, 2021) ................................................................. 23

## PRELIMINARY STATEMENT

This subpoena dispute arises out of a putative class action—Case No. 20-cv-04577, pending in this Court ("Main Action")—in which Mish International Monetary, Inc. ("Mish") accuses Spires/Vega of manipulating the price of the May 2020 West Texas Intermediate crude oil futures contract ("May WTI Contract") through trading activity on April 20 and 21, 2020.

ExxonMobil is not a party to the Main Action and, as far it can discern, did not engage in any trading of the May WTI Contract with any of the parties to the Main Action. But in November 2023, Spires/Vega served subpoenas requesting nine categories of trading-related documents from ExxonMobil and 27 other companies. Many of these 28 subpoena recipients voluntarily produced responsive documents, whereas others—including Vitol, Inc. ("Vitol"), Glencore Ltd. ("Glencore"), and ExxonMobil—stood on their objections and refused to do so.

The Court has already received briefing, heard oral argument, and rendered a ruling requiring Vitol and Glencore to produce documents responsive to three of the nine categories of documents requested in Spires/Vega's subpoena. In rendering that mixed ruling, the Court indicated it was persuaded that Vitol and Glencore—the world's largest traders of crude oil— occupied a unique position in the market that increased the potential relevance of their documents and set them apart from the other 26 companies that had received identical subpoenas. Ex. 1 at 5:15:15-21 ("I am persuaded that Vitol's and Glencore's unique roles in the market make them different and increases the potential relevance of their participation and their insight into the events surrounding the May 2020 WTI futures contract. Vitol's and Glencore's evidence may have value that isn't already covered by other subpoena recipients.").

Spires/Vega are now back before the Court, seeking to compel ExxonMobil to produce the same three categories of documents that Vitol and Glencore were required to produce plus a fourth category of documents that the Court did not require from Vitol and Glencore. These documents

1

contain ExxonMobil's confidential and proprietary information, and Spires/Vega must therefore demonstrate that the documents are both relevant and necessary. Spires/Vega have failed to carry their burden, and their Motion should be denied in its entirety because, as detailed herein:

- Although Spires/Vega repeat the same arguments they made in the Vitol and Glencore subpoena disputes, those arguments—and the Court's associated ruling—do not apply to ExxonMobil given its relatively limited role in WTI trading.

- Spires/Vega have not offered any credible argument supporting that ExxonMobil's documents are necessary or incrementally relevant given that at least 24 companies that received identical subpoenas have already produced responsive documents, including Vitol and Glencore (the world's largest traders) and at least three multinational oil companies (Shell, BP, and Chevron) that engaged in more WTI trading than ExxonMobil.

- Spires/Vega ignore the fact that ExxonMobil's documents would not be admissible in the Main Action, which further undermines any suggestion that ExxonMobil's documents are somehow necessary to Spires/Vega's defense of the Main Action.

- Spires/Vega's request to compel ExxonMobil to produce a fourth category of documents is based on the same arguments the Court rejected as to Vitol and Glencore, and those arguments have only grown weaker now that at least 12 companies that accept and store oil in Cushing have produced documents in response to subpoenas.

In the alternative, to the extent the Court is not inclined to deny the Motion in its entirety at this time, any ruling should be deferred until class certification is decided, as that decision will guide the analysis of whether Spires/Vega's subpoena is proportional to the needs of the case.

## <u>BACKGROUND</u>

As the Court is aware, Mish alleges in the Main Action that in April 2020, Spires/Vega (and ten individual traders associated with Spires/Vega) conspired to depress the price of the May WTI Contract in violation of the Commodity Exchange Act and Sherman Antitrust Act.

Spires/Vega and Mish have engaged in an extraordinary amount of third-party discovery in the Main Action. As detailed below, these efforts include serving at least 68 subpoenas seeking documents from third-parties (with at least 48 of those subpoena recipients having already produced responsive documents), taking at least two depositions of non-parties, and serving two

deposition subpoenas that the non-party recipients (BP and Shell) are presently opposing:

- At some point prior to July 2023, Mish issued 13 subpoenas seeking documents from the Intercontinental Exchange ("ICE"), Chicago Mercantile Exchange ("CME"), GH Financials Ltd., GH Financials LLC, Trading Technologies, ADM Investor Services, Three Lakes Advisors, Archer Financial Services, Interactive Brokers, TD Ameritrade, E*-Trade, AMP Global, and Gain Capital. Main Action ECF No. 244 pp. 3-4.[1] At least 11 of these 13 subpoena recipients have produced responsive documents. *Id.* p. 4 (as of July 12, 2023, ADM Investor Services, Trading Technologies, and Three Lakes Advisors had produced documents); Main Action ECF No. 282 p. 3 (as of December 14, 2023, the CME, ICE, GH Financials LLC, Gain Capital, Interactive Brokers, AMP Global, E*Trade, and Trading Technologies had also produced documents).

- At some point prior to July 2023, Spires/Vega issued six subpoenas seeking documents from ADM Investor Services, ICE, CME, Three Lakes Advisors, Archer Financial Services, and Oak Trading Systems. Main Action ECF No. 244 p. 4. At least four of these six subpoena recipients have produced responsive documents. *Id.* p. 4 (as of July 12, 2023, ADM Investor Services had produced documents); Main Action ECF No. 282 p. 3 (as of December 2023, ICE, CME, and Three Lakes Advisors had also produced documents).

- In September 2023, Mish issued a second subpoena seeking documents from non-party Trading Technologies. Main Action ECF No. 282 p. 5. Trading Technologies has produced responsive documents. *Id.* p. 3.

- In November 2023, Spires/Vega issued subpoenas seeking documents from 28 non-parties (including Exxon Mobil) that Spires/Vega describe as "large companies trading WTI on NYMEX in April 2020." Main Action ECF No. 367 p. 4. At least 24 of those 28 subpoena recipients have produced responsive documents. *Id.* pp. 4-5 (as of July 12, 2024, 23 of the 28 subpoena recipients had produced responsive documents and a 24th company—Glencore Ltd.—would be producing documents on or before July 16th).

- At some unknown point, Mish or Spires/Vega issued subpoenas seeking documents from non-parties High Ridge Futures and Vision Financial Markets, both of which produced responsive documents. Main Action ECF No. 282 p. 3 (stating that both companies had produced documents in response to subpoenas).

- In December 2023, Spires/Vega took the depositions of two non-party brokerage firm executives: (1) John Felag, Chief Risk Officer at High Ridge Futures; and (2) Justin Boshnack, former President of Three Lakes Advisors. Main Action ECF No. 282 p. 2.

---

[1] Citations to documents filed in this Case (1:24-cv-07108) will be cited as "ECF No. ###." Citations to documents filed in the Main Action (Case No. 20-cv-04577) will be cited as "Main Action ECF No. ##," whereas citations to documents filed in the Glencore (Case No. 1:24-cv-02628), Vitol (Case No. 1:24-cv-01492), BP (Case No. 1:24-cv-04226), and Shell (Case No. 1:24-cv-05206) subpoena disputes will be cited, respectively, as "Glencore Action ECF No. ##," "Vitol Action ECF No. ##," "BP Action ECF No. ##," and "Shell Action No. ##." All pinpoint citations to documents filed in these actions will reference the ECF page numbers stamped at the top of the page.

- In January 2024, Mish issued subpoenas seeking documents from 18 non-parties described as "the original sources for deliverable supply in and around Cushing, Oklahoma, i.e., the owners of the storage tanks and pipelines appurtenant thereto." Main Action ECF No. 367 p. 5. At least 12 of those 18 subpoena recipients have produced responsive documents. *Id.*

- In April 2024, Spires/Vega served subpoenas seeking depositions from non-parties Shell Trading (U.S.) Company ("Shell") and BP Products North America, Inc. ("BP"). Main Action ECF No. 267 p. 4. Shell and BP have both filed motions to quash those deposition subpoenas, which motions are presently pending in two different actions before this Court. *See* Case No. 1:24-cv-5206 (the "Shell Action") and Case No. 1:24-cv-4226 (the "BP Action").

ExxonMobil is not a party to the Main Action. Likewise, Mish and Spires/Vega have not alleged that ExxonMobil engaged in any relevant trades (i.e., trading of the May WTI Contract on April 20, 2020 or April 21, 2020) with any parties to the Main Action. Instead, ExxonMobil's investigation supports that—as far as it can discern[2]—it did not engage in any such trades with any of the parties to the Main Action. Ex. 2 ¶ 5.

Notwithstanding its lack of connection to the Main Action, ExxonMobil was one of the 28 "large companies trading WTI on NYMEX in April 2020" (as described by Spires/Vega) that received subpoenas from Spires/Vega in November 2023. Main Action ECF No. 367 p. 4. The subpoena contained nine requests for production (RFPs) seeking documents sufficient to show:

**RFP No. 1:** The type (i.e., purchase or sale), amount (including both number of lots and price per lot), and time of each trade made by ExxonMobil on April 20, 2020 and April 21, 2020 involving the May WTI contract.

**RFP No. 2:** When and how each position that ExxonMobil held in the May WTI contract on April 20, 2020 and April 21, 2020 was liquidated.

**RFP No. 3:** The amount of any long or short position ExxonMobil held in the May WTI contract at any time on April 20, 2020.

**RFP No. 4:** Whether and when ExxonMobil knew or believed that the May WTI contract could trade at negative prices.

**RFP No. 5:** Communications between ExxonMobil and the CME, NYMEX, or ICE relating

---

[2] Certain trades are anonymized, such that ExxonMobil does not know the identity of its counterparty. Ex. 2 ¶ 5 n. 1.

to the May WTI contract.

**RFP No. 6:**  ExxonMobil's trading and/or rollover strategy with respect to the May WTI contract and/or the April 20, 2020 trading day.

**RFP No. 7:**  Whether ExxonMobil accepted (or considered accepting) or stored (or considered storing) any crude oil it purchased under the May WTI contract and, if applicable, the amount of crude oil that ExxonMobil accepted and/or stored.

**RFP No. 8:**  Communications between ExxonMobil and any third parties relating to the May WTI contract.

**RFP No. 9:**  The number and identity of any third parties who traded or invested in the May WTI contract through ExxonMobil, the earnings or losses of those third parties, and the terms of any settlements or agreements between ExxonMobil and those third parties with respect to the May WTI contract.

ECF No. 1-11 pp. 11-12.[3]

On December 8, 2023, ExxonMobil served timely objections to the requests for production in Spires/Vega's subpoena.  ECF No. 1-12.  Among other bases, ExxonMobil objected that the requests sought confidential and proprietary information regarding ExxonMobil's trades and trading strategies, which was particularly concerning given that Mish and Spires/Vega compete with ExxonMobil in the same trading markets and could obtain an unfair advantage in obtaining ExxonMobil's sensitive documents.  *Id.*  ExxonMobil also objected that the requests were overbroad, unduly burdensome, and beyond the scope of permissible discovery considering the amount in controversy, the limited probative value associated with the requested information, and the parties' ability to obtain the same (or similar information) through less burdensome means.  *Id.*

After ExxonMobil served its objections in December 2023, counsel for ExxonMobil and Spires/Vega met and conferred on numerous occasions.  During this same time period, counsel for

---

[3]  Spires/Vega claim the subpoena "sought only documents 'sufficient to show' how and when [ExxonMobil] traded the May WTI Contract on April 20 and 21, 2020."  Motion p. 2.  As shown above, the subpoena sought documents extending well beyond the when and how of ExxonMobil's trading, including documents speaking to ExxonMobil's internal beliefs and strategies and its communications with third parties.  Moreover, none of the documents Spires/Vega are now seeking from ExxonMobil deal with the when and how of ExxonMobil's trading.

Spires/Vega was also meeting and conferring with the 27 other companies that had received identical subpoenas. Many of those companies apparently agreed to produce responsive documents, though it appears the level of compliance varied greatly. *E.g.,* Shell Action ECF No. 19 p. 11 (stating that Shell produced 16 pages of responsive documents); BP Action ECF No. 1 p. 2 (stating that BP produced over 30,000 pages of responsive documents).

Two of the 28 companies that received subpoenas for their trading records—Vitol and Glencore—actively opposed the subpoenas. Vitol opposed the subpoena through filing a motion to quash in the Southern District of Texas, which motion was transferred to this Court and fully briefed under Case No. 1:24-cv-01492 (the "Vitol Action"). Similarly, Spires/Vega filed a motion to compel compliance against Glencore in the Southern District of New York, which motion was also transferred to this Court and briefed under Case No. 1:24-cv-02628 (the "Glencore Action").

As more fully detailed below (*infra* pp. 10-13), in seeking to compel Vitol and Glencore to comply with the subpoena, Spires/Vega submitted evidence establishing that Vitol and Glencore are the world's largest crude oil traders and argued that—as a result thereof—Vitol and Glencore possessed unique and valuable information that could not be obtained from the other 26 subpoena recipients. Vitol Action ECF No. 7 p. 9 ("As the world's largest independent oil trader, Vitol possesses important information on why there was not more demand for the May WTI Contract on April 20, 2020"); Glencore Action ECF No. 2 p. 8 ("As one of the world's leading marketers of crude oil and oil products, Glencore possesses important information on why there was not more demand for the May WTI Contract on April 20, 2020").

The Vitol Subpoena Dispute was the subject of an oral hearing before the Court on April 3, 2024. During this hearing, counsel for Spires/Vega emphasized that—due to their "unique" position as the world's largest oil traders—Vitol and Glencore possess information that could not

be obtained through the documents that had already been produced by ~20 companies that had received identical subpoenas. Vitol Action ECF No. 20 at 11:24-12:3 ("Because Vitol is uniquely situated. They are trading…seven million barrels of oil per day, and they are going to have a unique perspective on the market[.]"); *id.* at 26:23-27:9 ("And, Your Honor, Glencore is similarly situated to Vitol in the sense that they are one of the few of the 28 [subpoena recipients] who are actually trading oil, moving oil in the way that Vitol described in their brief ….So that's why Vitol and Glencore are important to us, among the 28 [subpoena recipients]."); *id.* at 28:24-29:2 (Court: "And you don't think you're getting enough from the people who have complied with the subpoenas?" Counsel for Spires/Vega: "Not given their unique position with possession of oil.").

The Court issued a ruling on the Vitol and Glencore subpoena disputes during an oral hearing on May 30, 2024 (Ex. 1), which ruling was also reduced to a minute order (Main Action ECF No. 338). Specifically, the Court ruled that Vitol and Glencore did not have to produce any documents in response to RFP Nos. 1, 2, 3, 6, and 8, but did require that Vitol and Glencore partially comply with RFP Nos. 4, 5, and 7 by producing documents sufficient to show:

- Vitol's and Glencore's "understanding of storage at Cushing for the May WTI contract as of April 20, 2020."

- "[W]hether and when [Vitol and Glencore] thought the price for the May WTI contract would go negative. [Vitol and Glencore] don't need to produce documents explaining in depth how or why [they] knew that, but some indicia of the basis for that belief; if it existed, that belief."

- Vitol's and Glencore's "communications with the CME, The New York Mercantile Exchange, or the Intercontinental Exchange about the May 2020 WTI Contract, limited to notices received from those entities, and correspondence with those entities about the April 2020, 2020 and April 21, 2020 trading in the May 2020 WTI contract."

Ex. 1 at 7:15-8:8. In issuing this ruling, the Court noted that—although other subpoena recipients had already produced responsive documents—the Court was "persuaded that Vitol's and Glencore's unique roles in the market make them different and increases the potential relevance"

7

of their documents, and that "Vitol's and Glencore's evidence may have value that isn't already covered by other subpoena recipients." *Id.* at 5:15:5-21.

After the Court issued its ruling on the Vitol and Glencore subpoena disputes, counsel for Spires/Vega and ExxonMobil conferred several more times. Although various proposals were floated, the parties could not reach an agreement regarding ExxonMobil's subpoena compliance. Having reached an impasse, Spires/Vega filed their Motion to compel ExxonMobil to comply with the subpoena. Spires/Vega's Motion was originally filed in the Southern District of Texas, but ExxonMobil consented to a transfer and the Motion is now before this Court.

In their Motion, Spires/Vega ask the Court to compel ExxonMobil to produce the same three categories of documents that the Court ordered Vitol and Glencore to produce. Motion p. 2. In addition, Spires/Vega also ask the Court to compel ExxonMobil to produce a fourth category of documents, namely, "documents sufficient to show the extent to which ExxonMobil agreed to accept physical delivery of oil pursuant to the May WTI Contract." *Id.* Spires/Vega had also asked the Court to require Vitol and Glencore produce that same fourth category of documents, but the Court declined to do so. Vitol Action ECF No. 7 p. 6; Glencore Action ECF No. 2 p. 10; Main Action ECF No. 338.

As detailed herein, Spires/Vega have failed to carry their burden in demonstrating that the four categories of documents they seek from ExxonMobil are relevant and necessary to their defense in the Main Action. Their Motion should therefore be denied.

## ARGUMENT & AUTHORITIES

### I. The Requested Materials Comprise Confidential and Sensitive Information

Spires/Vega ask the Court to compel ExxonMobil to produce: (1) documents showing ExxonMobil's understanding of storage at Cushing for the May WTI contract as of April 20, 2020; (2) documents showing whether and when ExxonMobil thought the price of the May WTI Contract

would go negative; (3) certain correspondence with the CME, NYMEX, and ICE regarding trading of the May 2020 Contract; and (4) documents showing the extent to which ExxonMobil agreed to accept physical delivery of oil under the May WTI Contract. Motion p. 6.

As established in the attached Declaration of Johann Song, ExxonMobil has consistently treated the requested materials as "highly confidential and proprietary." Ex. 2 ¶ 7. ExxonMobil does not disclose the materials and instead engages in substantial efforts to keep the materials confidential. *Id.* As Mr. Song explains, disclosing these materials—even in a limited capacity and subject to certain protections—has the potential to cause irreparable harm by revealing confidential and proprietary information regarding ExxonMobil's trading practices to entities and individuals (including traders affiliated with Spires/Vega and Mish) that actively compete against ExxonMobil in the same trading markets. *Id.* ¶ 10. This concern is even more stark given the fact that Spires/Vega are accused of illegally conspiring to manipulate the same trading markets in which they compete with ExxonMobil. *Id.* As Mr. Song concludes, disclosing the requested materials "would reveal ExxonMobil's confidential and proprietary information to its competitors and put ExxonMobil at a competitive disadvantage by revealing ExxonMobil's trading details and internal strategies to entities (including entities accused of illegally conspiring to manipulate trading markets) that compete with ExxonMobil in the same trading markets." *Id.* ¶ 11.

Spires/Vega have effectively conceded that the requested information is sensitive, confidential, and proprietary. In particular, during the oral hearing on Vitol's motion to quash, the Court asked Spires/Vega whether the requested information was truly sensitive. Vitol Action ECF No. 20 at 20:21-23 ("[D]o you think information about a reaction to a market event four years ago is stale anyway and shouldn't have competitively sensitive value?"). To his credit, counsel for Spires/Vega acknowledged that Spires/Vega had asked the Court to treat their own, comparable

information as sensitive and confidential and it would be inconsistent for them to claim that Vitol's similar information should not receive the same treatment. *Id.* at 20:24-21:2 ("Your Honor, we've tried to take a consistent position. We'd asked for our information to be kept under seal because we think there is confidential information. We think Vitol is in the same position….").

Likewise, courts routinely find that similar information relating to trading strategies and communications is confidential. *E.g., Quantlab Techs. v. Godlevsky,* 2012 WL 12894142, at *1 (S.D Tex. Feb. 27, 2012) (denying motion to compel production of "highly valuable proprietary trade secrets in the form of trading strategies and communications"); *In re NASDAQ Market-Makers Antitrust Litig.*, 164 F.R.D. 346, 355 (S.D.N.Y. Jan. 16, 1996) (recognizing that communications involving "trading strategies" are "exactly the sort of confidential commercial information contemplated by Rule 26(c)").

Indeed, this Court acknowledged that the requested information is confidential when ordering Vitol and Glencore to partially comply with their subpoenas. Ex. 1 at 11:2-23 (the Court acknowledging concerns raised by Glencore regarding the disclosure of confidential materials and recognizing that the existing protective order may need to be modified to address those concerns).

In summary, as established by the Declaration of Johann Song (Ex. 2), as conceded by counsel for Spires/Vega, and as acknowledged by multiple courts (including this one), the information requested by Spires/Vega is sensitive and confidential commercial information.

## II. Spires/Vega's Arguments—and the Court's Ruling—as to Vitol and Glencore Are Inapplicable Given ExxonMobil's Relatively Limited Trading Activity.

In seeking documents from Vitol and Glencore, Spires/Vega emphasized that—due to their dominant roles in crude oil trading—Vitol and Glencore possess unique and important information that cannot be obtained from the 26 other subpoena recipients.

For example, Spires/Vega quoted a financial journal to establish that Vitol is "the world's

largest independent oil trader" and argued that as "the world's largest independent oil trader, Vitol possesses important information on why there was not more demand for the May WTI Contract on April 20, 2020." Vitol Action ECF No. 7 pp. 6, 9. Similarly, Spires/Vega quoted Glencore's website to establish that Glencore is "one of the world's leading marketers of crude oil" and argued that as "one of the world's leading marketers of crude oil and oil products, Glencore possesses important information on why there was not more demand for the May WTI Contract on April 20, 2020." Glencore Action ECF No. 2 pp. 5, 8.

Likewise, during the April 3, 2024 hearing regarding the Vitol subpoena, counsel for Spires/Vega reiterated that—due to their "unique" position as market leaders in oil trading—Vitol and Glencore possess information that could not be obtained from the 26 other subpoena recipients. Vitol Action at 11:24-12:3 ("Because Vitol is uniquely situated. They are trading…seven million barrels of oil per day, and they are going to have a unique perspective on the market[.]"); *id.* at 26:23-27:9 ("Glencore is similarly situated to Vitol in the sense that they are one of the few of the 28 [subpoena recipients] who are actually trading oil, moving oil in the way that Vitol described in their brief ….So that's why Vitol and Glencore are important to us, among the 28 [subpoena recipients].") ; *id.* at 28:24-29:2 (Court: "And you don't think you're getting enough from the people who have complied with the subpoenas?" Counsel for Spires/Vega: "Not given their unique position with possession of oil.").[4]

---

[4] Spires/Vega also emphasized that Vitol's CEO made public statements specifically addressing trading of the May WTI Contract on April 20, 2020, including statements regarding possible causes for the negative pricing that occurred that day. *E.g.*, Vitol Action ECF No. 7 p. 7 (quoting Vitol's CEO as stating that "for the first time, a major oil price benchmark turned negative" and that this "was largely caused by an exceptional interaction of the physical and financial markets"). Spires/Vega offer no evidence that ExxonMobil's executives made similar statements directed toward the negative trading price of the May WTI contract or the causes thereof. Instead, Spires/Vega cite unremarkable statements in which ExxonMobil observed that Covid-19 had reduced demand for oil and triggered lower oil prices, which prompted ExxonMobil to tighten its belt in reducing spending levels. Motion p. 7.

Spires/Vega's arguments appear to have factored into the Court's decision to compel Glencore and Vitol to partially comply with the subpoena. To wit, in announcing its decision, the Court remarked:

> Although there are other subpoena recipients who have worked out compliance with the subpoena, **I am persuaded that Vitol's and Glencore's roles in the market make them different and increases the potential relevance** of their participation and their insight into the events surrounding the May 2020 WTI futures contract. **Vitol's and Glencore's evidence may have value that isn't already covered by the other subpoena recipients.**

Ex. 1 at 5:15-21 (emphasis added).

ExxonMobil is fundamentally different than Vitol and Glencore.[5] Again, Vitol and Glencore are generally recognized as the first and second largest (respectively) crude oil traders in the world. Ex. 3 (article describing Vitol as "the world's largest independent oil trader"); Ex. 4 (article identifying the "Top 10 Biggest Oil Trading Companies in the World," with Vitol and Glencore topping the list); Ex. 5 (article identifying "The World's Largest Oil Traders," with Vitol and Glencore respectively listed first and third).

By contrast, ExxonMobil is a relatively new and minor participant in oil trading that attempted a limited build-out of its trading department in 2018. Ex. 6 ("Exxon had long shunned derivatives trading, even for hedging purposes, but made a tentative entry in 2018."); Ex. 7 (explaining that, prior to 2018, "[t]rading ha[d] been a virtual four-letter word at Exxon" and that— although ExxonMobil was "break[ing] with the past" in seeking to expand its trading department

---

[5] Spires/Vega claim—without any evidentiary support—that ExxonMobil is "one of the world's leading marketers of crude oil and oil products." Motion p. 12. This claim was lifted verbatim from Spires/Vega's motion to compel against Glencore, where the statement was supported by a reference to Glencore's website. Glencore Action ECF No. 2 p. 9. In addition to lacking any evidentiary support as to ExxonMobil, the claim conflates marketing with trading and crude oil/WTI for oil products. Oil can be marketed without being traded through an exchange, and ExxonMobil markets "oil products" other than crude oil/WTI. Thus, the claim that ExxonMobil is "one of the world's leading marketers of crude oil and oil products" is not only unsubstantiated but also says nothing regarding the extent to which ExxonMobil trades WTI.

to hedge its own production—"Exxon still doesn't plan to begin speculative paper trading").

As widely reported, the 2018 expansion of ExxonMobil's trading desk "unraveled quickly in [2020] as the firm slashed the unit's funding" in the wake of the coronavirus pandemic. Ex. 8. Thus, less than two years after announcing plans to expand its trading desk, ExxonMobil "downsized the [trading] department" when the pandemic hit in early 2020. *Id.* Instead of aggressively trading during this time period, ExxonMobil employed a "cautious strategy" in which traders were "restricted to mostly routine deals intended as a hedge for Exxon's more traditional crude and fuel sales rather than gambles seeking to maximize profit." *Id.*

In short, Spires/Vega established that Vitol and Glencore are among the largest oil traders in the world and argued that—as a result thereof—Vitol and Glencore possess unique information that was especially important and could not be obtained from the other subpoena recipients. These arguments factored into the Court's ruling as to the Vitol and Glencore subpoenas. But as established herein, ExxonMobil is nothing like Vitol and Glencore. Thus, Spires/Vega's arguments—and the Court's ruling—on the Vitol and Glencore subpoena disputes do not apply to ExxonMobil. Instead, the Court should take a fresh look at the issues in deciding whether to compel ExxonMobil to comply with the subpoena.

## III. Spires/Vega Have Not Carried Their Burden in Demonstrating that the Requested Materials Are Necessary and Relevant.

Where—as here—a subpoena seeks confidential information from a non-party, "the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information." *Suture Express v. Cardinal Health 200*, 2014 WL 6478077, at *4 (N.D. Ill. Nov. 18, 2014).

In seeking to carry their burden in demonstrating that the requested materials are necessary

to their case, Spires/Vega must do more than simply show that the materials will help establish some component of their defense. *See Concord Boat v. Brunswick Corp.*, 1996 WL 705260, *3 (N.D. Ill. Dec. 4, 1996) (rejecting the argument that a non-party should be compelled to produce confidential documents in response to a subpoena where the movant argued that the documents would "help establish the relevant markets" in an antitrust case). Instead, Spires/Vega must demonstrate that the requested materials "are truly necessary" to their case and cannot be obtained from other sources. *Id.* (denying motion to compel where the movant had "not sufficiently demonstrated that these broad requests are truly necessary"). Likewise, "[m]ere assertions of necessity are insufficient," and Spires/Vega must instead present "evidence that these documents are necessary in light of [] other documents which were already produced." *Id.*

Spires/Vega have failed to carry their burden.

A.    **Having Already Obtained Documents from Multiple Companies (Including Vitol, Glencore, and at Least Three Multinational Oil Companies) that Engage in More Trading than ExxonMobil, Spires/Vega Have Not Established that ExxonMobil's Documents Are Necessary.**

Spires/Vega offer two assertions as purportedly supporting that they need the requested materials from ExxonMobil. Motion pp. 13-15. The assertions lack supporting evidence, are entirely specious, and must be rejected.

First, Spires/Vega assert that the "need for discovery from ExxonMobil is compelling because the information from the largest traders can best prove why there was no significant demand for the May WTI Contract at zero or negative prices." Motion p. 13. This argument was cut-and-pasted from Spires/Vega's briefing in the Glencore and Vitol subpoena actions. Glencore Action ECF No. 2 p. 15 ("The need for discovery from Glencore is compelling because the information from the largest traders can best prove why there was no significant demand for the May WTI Contract at zero or negative prices."); Vitol Action ECF No. 7 pp. 13-14 ("The need for

discovery from Vitol is compelling because the information from the largest traders can best prove why there was no significant demand for the May WTI Contract at zero or negative prices.").

But as established above, Spires/Vega offer nothing to support that ExxonMobil is one of the "largest traders" of WTI. *Supra* pp. 12-13. Instead, the evidence included herewith establishes that—during the relevant time frame (i.e., April 2020)—ExxonMobil engaged in limited and conservative trading operations. *Id.* Simply stated, if Spires/Vega need information from the "largest traders" of WTI, it will not be obtained through ExxonMobil but through the documents that the largest traders of WTI—including, Vitol and Glencore—have already produced.

Second, Spires/Vega assert that they "need to show that a variety of large traders had no demand for oil, including multinational oil companies" like ExxonMobil. Motion p. 14. But again, this assertion is entirely specious given that at least three multinational oil companies that engage in more trading than ExxonMobil have already produced responsive documents.

Specifically, BP, Shell, and Chevron have all produced documents in response to identical subpoenas issued by Spires/Vega.[6] Like ExxonMobil, BP, Shell, and Chevron are all multinational oil companies. But as widely recognized, BP, Shell, and Chevron are more active in crude oil trading than ExxonMobil, especially back in 2020. Ex. 7 ("Exxon has long lagged behind rivals BP Plc, Chevron Corp and Royal Dutch Shell, Plc, which have created trading units that occasionally generate more profit than their refining business….Exxon would also normally hedge only cargoes going from one region to another…BP and Shell would normally hedge all cargoes as well as taking sometimes a pure speculative position on the paper market."); Ex. 6 (reporting— in February 2023—that "ExxonMobil is creating a global trading desk to compete more

---

[6] Shell's and BP's document productions are discussed in the briefing in the Shell and BP deposition subpoena disputes pending before the Court. *See supra* p. 6. In response to an inquiry from ExxonMobil's counsel, counsel for Spires/Vega confirmed that Chevron also produced responsive documents.

aggressively with the likes of BP, Shell, and commodities trading houses…."); Ex. 8 (reporting that, while ExxonMobil "retreated from oil trading in [the] pandemic," "Exxon's biggest rivals made enormous trading profits [in 2020] as their traders bought oil and stored it when prices plunged, then sold it at higher prices for future delivery.  Rival Royal Dutch Shell said in March that it doubled its 2020 trading profits to $2.6 billion over the previous year.  BP Plc's trading earned about $4 billion…").

Spires/Vega offer no explanation (much less evidence) as to why the documents received from BP, Shell, and Chevron—not to mention the documents received from (at least) 46 other non-parties that have already produced documents in response to subpoenas issued by the parties to the Main Action (*supra* pp. 3-4)—are inadequate to satisfy their purported need to "need to show that a variety of large traders had no demand for oil, including multinational oil companies."  No credible explanation exists.  Instead, if Spires/Vega truly need to show that multinational oil companies had no demand for oil in April 2020, they should look to those documents already produced by BP, Shell, and Chevron.

During the May 30, 2024 hearing on the Vitol/Glencore subpoena disputes, the Court stated that "Vega already has access to information to explain why the May contract was undesirable. But corroboration is relevant."  Ex. 1 at 7:2-4.  And, as discussed above, it appears the Court was persuaded that limited corroboration from Vitol and Glencore had probative value given their unique status as the world's largest crude oil traders.  *Supra* pp. 7-8; Ex. 1 5:15-21 ("I am persuaded that Vitol's and Glencore's roles in the market make them different and increases the potential relevance….Vitol's and Glencore's evidence may have value that isn't already covered by the other subpoena recipients.").  But in seeking compliance from Vitol and Glencore, Spires/Vega submitted evidence establishing that Glencore and Vitol were uniquely situated as the

world's largest oil traders. *Supra* pp. 10-11. Moreover, there was no indication that Spires/Vega had already obtained responsive documents from similarly-situated companies that conducted even more trading than Vitol and Glencore. Thus, there was some evidence supporting that Vitol and Glencore were unique and that corroborating documents from those two companies would address a particular need that other subpoena recipients could not.

None of those considerations apply here. Spires/Vega have offered nothing to support that ExxonMobil is meaningfully unique from Shell, Chevron, and BP or that ExxonMobil's documents offer some corroborating value above and beyond the documents that Spires/Vega have already received from Shell, Chevron, and BP. Instead, Spires/Vega merely assert that they need documents from multinational oil companies, while ignoring that they have already obtained such documents from three such companies.

Indeed, the only actual evidence (as opposed to mere assertions) cited by Spires/Vega as purportedly supporting their need to obtain documents from ExxonMobil further confirms that Shell and BP—and not ExxonMobil—are more appropriate sources. Specifically, Spires/Vega argue that information from ExxonMobil is necessary because Mish's designated expert (Dr. Craig Pirrong) gave the following deposition testimony:[7]

> Q:  And if I ask you about any other large traders, like BP or Shell, would you have any personal knowledge of how or why any of those traders traded that day?
>
> A:  No, I do not under—I do not have knowledge of their intent in terms of how they were trading.

Motion p. 14. Dr. Pirrong's above testimony does not in any way support that Spires/Vega need

---

[7]  Here again, this argument was lifted verbatim from Spires/Vega's opposition to BP's Motion to Quash. BP Action ECF 17 pp. 10-11. The fact that Spires/Vega are repeating the same arguments as to ExxonMobil that they made in relation to Vitol, Glencore, BP, and Shell further demonstrates that the information they seek from ExxonMobil is not unique from the information Spires/Vega have already obtained from the 24 recipients of identical subpoenas (including Vitol, Glencore, BP, and Shell) that have produced documents.

information from ExxonMobil. Instead, if Spires/Vega are looking to counter Dr. Pirrong's speculation as to the intent of "large traders, like BP or Shell," they should resort to the documents already produced by large traders, like BP or Shell.

In the Glencore Action, Spires/Vega stated that they "have always emphasized the importance of gathering evidence from a cross-section of large traders, not just one or two or five." Glencore Action ECF No. 20 p. 9. But Vega and Spires have now obtained responsive documents not just from one or two or five large traders, but from at least 24 companies, including the two largest oil traders in the world (Vitol and Glencore) and at least three multinational oil companies (Shell, BP, and Chevron) that engaged in more WTI trading than ExxonMobil. Spires/Vega have not offered any credible explanation—much less, evidence—supporting that they truly need to obtain similar documents from a 25th company, much a less a 25th company that (like ExxonMobil) engaged in less relevant trading than many (if not most or all) of the 24 companies that have already produced documents. Having failed to demonstrate any true need to obtain documents from ExxonMobil, Spires/Vega's Motion should be denied.

### B. Documents Obtained from ExxonMobil Would Not Be Admissible in the Main Action, Which Further Undermines any Argument that Spires/Vega Need the Documents.

All of Spires/Vega's arguments regarding a purported need to obtain documents from ExxonMobil are further undermined by the fact that ExxonMobil's documents would not even be admissible evidence in the Main Action.

Spires/Vega have effectively conceded that the documents produced by the 24 recipients of identical subpoenas are inadmissible.[8] For example, after BP and Shell produced documents

---

[8] Spires/Vega's counsel also conceded this point during meet and confers with ExxonMobil's counsel. Specifically, throughout the meet and confer process, ExxonMobil proposed that it may be willing to produce certain responsive documents if Spires/Vega would not thereafter insist on a deposition.

responsive to Spires/Vega's subpoena, Spires/Vega served both companies with deposition subpoenas. In responding to BP's and Shell's motions to quash those deposition subpoenas, Spires/Vega argued that depositions are essential because the documents produced by BP, Shell, and other subpoena recipients are inadmissible. Shell Action ECF No. 19 p. 17 ("There is no substitute for a deposition of [Shell]….While [Shell] argues that some trading data has been produced by some traders….none of those trading companies have provided admissible testimony[.]"); *id.* p. 22 (stating that, although Shell produced responsive documents, Spires/Vega needed Shell's deposition because "Vega and Spires must obtain admissible evidence"); BP Action ECF No. 17 p. 2 ("To avoid hearsay or other evidentiary objections by the Plaintiff in the *Mish* case, Vega and Spires need the [BP] deposition to elicit admissible testimony about why BP Products traded the May WTI Contract on April 20, 2020 in the way they did.").

Although Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that information need not be admissible in evidence to be discoverable, that Rule does not speak to the issue of whether Spires/Vega have carried their burden in demonstrating that they truly need ExxonMobil's documents. For example, in *Burns v. SeaWorld Parks & Entertainment*, the plaintiffs issued a third-party subpoena for documents that would not be admissible at trial. No. CV 22-2941, 2023 WL 11884592, at *1 (E.D. Pa. Nov. 4, 2023). In opposing the third party's motion to quash, the plaintiffs pointed out that inadmissible information may still be discoverable. *Id.* at *4-5. Although the Court agreed with that position, the Court nonetheless recognized that the inadmissible nature of the documents undermined the plaintiffs' purported need for the documents, and thus quashed the subpoena. *Id.* at *4 (recognizing that—although information need not be admissible to be discoverable—"the fact that the information sought by Plaintiffs' subpoena is

---

Spires/Vega's counsel, however, explained that—because the documents were inadmissible—this proposal was unsatisfactory.

19

likely to be inadmissible suggests that Plaintiffs' need is marginal at best").

The same is true here. Spires/Vega offer no credible argument as to why they need documents from ExxonMobil given that the documents will not be admissible at trial. Instead, Spires/Vega offer disingenuous arguments, e.g., that "[d]ocuments from…ExxonMobil are important to show the jury that there was no demand for oil and that the price was not artificial on April 20." Motion p. 14. Having failed to articulate any credible need for obtaining ExxonMobil's inadmissible documents, Spires/Vega's Motion should be denied.

### C. Spires/Vega's Request to Compel ExxonMobil to Produce the Fourth Category of Documents Is Based on the Same Arguments the Court Rejected in the Vitol and Glencore Actions, and the Arguments Are Even Weaker Now that at Least 12 Storage Companies Have Produced Documents.

In addition to asking the Court to compel ExxonMobil to produce the same three categories of documents that Glencore and Vitol were ordered to produce, Spires/Vega also ask the Court to compel ExxonMobil to produce a fourth category of documents, namely, "documents sufficient to show the extent to which ExxonMobil agreed to accept physical delivery of oil pursuant to the May WTI Contract." *Id.* Spires/Vega also asked the Court to require that Vitol and Glencore produce that same fourth category of documents. Vitol Action ECF No. 7 p. 6; Glencore Action ECF No. 2 p. 10. But, as Spires/Vega acknowledge (and as the Court's order establishes), the Court rejected their request and did not require Vitol and Glencore to produce documents speaking to the extent to which they agreed to accept physical delivery of oil.[9] Motion p. 11 (acknowledging that "Judge Shah did not approve" this "fourth category of document requests…in his order for Vitol for Glencore"); Main Action ECF No. 338.

---

[9] The fact that Spires/Vega seek to compel ExxonMobil to produce this fourth category of documents after the Court declined to require that Glencore and Vitol produce the same documents is also contrary to their statement that "[a]fter Judge Shah ruled on the subpoena enforcement motions for Vitol and Glencore, Vega and Spires narrowed the scope of their subpoena requests to ExxonMobil in order to conform them with Judge Shah's order." Motion p. 8.

Although the Court did not expressly explain its refusal to compel Vitol and Glencore to produce documents establishing the extent to which they agreed to accept physical delivery of WTI, the Court did allude to a possible explanation. Specifically, during the April 3, 2024 hearing on the Vitol subpoena dispute, the Court seemed to recognize that the best source of information regarding the physical delivery of oil would come from the entities in Cushing, Oklahoma that receive and store that oil. Vitol Action ECF No. 20 at 13:4-13 ("And what about going to sources of information at Cushing, Oklahoma and the consequences of delivery there?....And if information about storage capacity there is relevant, you can get that information from them, I would think, and you wouldn't need a trader to say, "Well, I thought that there would be storage issues or delivery issues, so that's why I was not interested in even participating in this ostensibly-profitable transaction."").

As previously established, Mish has already issued 18 third-party subpoenas to "the original sources for deliverable supply in and around Cushing, Oklahoma, i.e., the owners of the storage tanks and pipelines appurtenant thereto," and at least 12 of those subpoena recipients have already produced responsive documents. *Supra* p. 3. Spires/Vega offer no explanation—much less evidence—as to why information regarding the delivery and storage of oil, to the extent it is relevant and necessary at all, cannot be obtained from these 18 oil storage companies.

Instead, Spires/Vega argue that they need documents establishing the extent to which ExxonMobil agreed to accept delivery of WTI because such documents are "the type of evidence that will show the lack of demand for oil on April 20, 2020 and that there was no artificial price." Motion p. 3. Again, this is just a rehash of the same arguments made by Spires/Vega—and rejected by the Court—in the Vitol/Glencore Actions. *E.g.*, Glencore Action ECF No. 2 p. 6 (arguing that the documents they sought from Glencore—including documents establishing the extent to which

Glencore agreed to accept delivery of WTI—would show "that there was no demand in the marketplace on April 20 for the May WTI contract and therefore no 'artificial price'"); Vitol Action ECF No. 7 p. 2 (making the identical argument as to Vitol's documents).

In summary, Spires/Vega have failed to offer any new evidence or argument supporting that this fourth category of documents is relevant and necessary to obtain from ExxonMobil, including evidence or argument supporting that any pertinent information cannot be obtained through the 12 non-party storage companies in Cushing that have already produced documents. Thus, Spires/Vega's request to compel ExxonMobil to produce documents establishing the extent to which it agreed to accept physical delivery of WTI should be rejected, just as the same request (based on the same arguments) was rejected in the Vitol and Glencore Actions.

**IV.  To the Extent Spires/Vega's Motion Is Not Denied in Its Entirety, the Court Should Defer Any Ruling Until Class Certification Is Decided, as that Decision Will Inform the Analysis of Whether the Subpoena Is Proportional to the Needs of the Case.**

In the Glencore and Vitol subpoena disputes, Spires/Vega argued that the subpoenaed materials were necessary and relevant with respect to both the merits and class certification. Vitol Action ECF No. 7 pp. 9-10 (arguing that Vitol's documents "will help establish why the plaintiffs' claims in the Illinois case are not typical and why individual issues will predominate over common issues"); Glencore Action ECF No. 2 p. 14 (repeating the same argument as to Glencore).

During the May 30th hearing on the Vitol and Glencore subpoena disputes, however, the Court indicated that the subpoenaed materials were not necessary or relevant to the issue of class certification. Ex. 1 at 6:6-13 ("I am not persuaded that the requested evidence will move the needle much on the typicality question."). Spires/Vega's argument that the subpoenaed materials are necessary and relevant to class certification has only grown weaker now that Spires/Vega have already filed their opposition to class certification. *See* Main Action ECF No. 352. That may explain why, in moving to compel ExxonMobil, Spires/Vega no longer argue that the subpoenaed

materials are necessary or relevant to class certification, but instead limit themselves to arguing that the materials are necessary and relevant with respect to the merits. Motion pp. 13-15.

Although Spires/Vega are no longer arguing that the subpoenaed materials are necessary and relevant to class certification, class certification is still a critical data point in analyzing the propriety of the subpoena. Specifically, in assessing the subpoena, the Court must consider (among other factors) whether the subpoena is proportional to the needs of the case. *Treadwell v. Salgado*, 2021 WL 11725352, at *3 (N.D. Ill. Dec. 14, 2021). Proportionality, however, hinges on class certification.

In arguing that proportionality is satisfied, Spires/Vega assume certification has been granted and that the class damages exceed $1 billion. Motion p. 16. The Court, however, has yet to rule on class certification. And if class certification is denied, the underlying lawsuit will comprise a single plaintiff's claims for $92,490 in damages. *See* Main Action ECF No. 202 ¶ 29 ("Plaintiff Mish incurred a net loss of approximately $92,490."). Spires/Vega do not contend that proportionality is satisfied in this scenario, and nor could they credibly do so. Instead, Spires/Vega's scorched earth approach in issuing 28 third-party subpoenas for confidential trading-related materials is clearly disproportional if Spires/Vega are facing a single plaintiff's claim for less than $100,000 in damages (or less than $300,000, if the damages are trebled).

Indeed, Spires/Vega previously argued that the Court should bifurcate discovery by allowing discovery as to certification while staying discovery as to the merits until certification is decided. Main Action ECF No. 198. In making that argument, Spires/Vega claimed bifurcating discovery "would maximize economy for the Court and the Parties" because—if the Court denied certification (or narrowed the proposed class)—it would greatly reduce the scope of discovery on the merits. *Id.* pp. 7-8. Spires/Vega further argued that it would be unfair to subject them to "years

of litigation based on a claim that they caused Plaintiff less than $100,000 in losses before Plaintiff is required to demonstrate that it should be permitted to represent a class." *Id.* p. 7.

Those same arguments apply with even more force in deciding whether to compel ExxonMobil to comply with Spires/Vega's subpoena. Mish's reply in support of class certification is due in September 2024, such that the issue of certification will soon be ripe for a ruling. *See* Main Action ECF No. 372 (Mish requesting that its deadline for replying in support of class certification be extended to September 17th). Thus, it would maximize economy for the Court, the parties, and ExxonMobil to wait the short period of time until certification is decided before compelling ExxonMobil to comply with any aspect of Spires/Vega's subpoena because—if the Court denies certification (or narrows the proposed class)—it could eliminate (or reduce) the need for any discovery from ExxonMobil. Likewise, if—as they argued—it would be unfair to subject Spires/Vega to substantial burdens before certification is decided, it would be even more unfair to subject non-party ExxonMobil to similar burdens when a decision on certification that could eliminate (or reduce) those burdens is forthcoming.

Thus, if the Court is not inclined to fully deny Spires/Vega's Motion at this time (e.g., on the basis that Spires/Vega have not demonstrated that they truly need the subpoenaed materials), the Court should delay any ruling until certification is decided, which decision will guide the analysis of whether Spires/Vega's subpoena is proportional to the needs of the case.

## <u>CONCLUSION</u>

For the reasons stated above, and for the reasons stated in ExxonMobil's objections to the requests for production in Spires/Vega's Subpoena (ECF No. 1-12), ExxonMobil respectfully requests that the Court deny Spires/Vega's Motion to Compel.

August 26, 2024                    Respectfully submitted by:

                                   **MCGINNIS LOCHRIDGE LLP**

                                   */s/ Seth M. Isgur*
                                   Seth M. Isgur
                                   Texas State Bar No. 24054498
                                   *sisgur@mcginnislaw.com*
                                   609 Main Street, Suite 2800
                                   Houston, Texas 77002
                                   (713) 615-8500
                                   (713) 615-8585 (fax)

                                   ***Attorney for ExxonMobil Oil Corporation***

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, a true and correct copy of the foregoing instrument was served on all counsel of record via electronic filing.

                                   */s/ Seth M. Isgur*
                                   Seth M. Isgur